IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TERESA ELDRIDGE,

    Plaintiff,

      v.

WACHOVIA CORPORATION
LONG-TERM DISABILITY PLAN,
et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:04-CV-2082-TWT

OPINION AND ORDER

    This is an ERISA action in which the Plaintiff seeks to recover disability benefits.  It is before the Court on the Defendants' Motion for Summary Judgment [Doc. 36] and the Plaintiff's Motion for Summary Judgment [Doc. 37].  For the reasons set forth below, the Defendants' motion is GRANTED and the Plaintiff's motion is DENIED.

I. BACKGROUND

    The Plaintiff, Teresa Eldridge, began her employment at Defendant Wachovia Corporation in May 1987.  She was covered under Wachovia's Long-Term Disability Plan ("the Plan").  The Plan states that an employee meets the definition of disability if:

> During the Elimination period and the next two years, the employee remains unable to perform any and every duty of his or her regular job or any other job for which he or she is qualified by training, education or experience.
>
> After two years, the employee remains unable to perform any occupation for which the employee is qualified by training, education, or experience and the employee is receiving Social Security Disability.

(Admin. Rec., at 165.)[1]  Defendants Liberty Mutual Insurance Company and Liberty Life Assurance Company of Boston acted as claims administrators of the Plan.

The Plaintiff continued to work at Wachovia until the onset of her alleged disability around October 8, 1999.  At that time, she was a senior vice president. When the Plaintiff stopped working for Wachovia, she began to receive short-term disability payments pursuant to Wachovia's non-ERISA payroll plan.  Once her short-term disability payments ended, the Plaintiff was considered for long-term disability ("LTD") benefits.  The Defendants approved her claim for LTD benefits under the Plan and paid her benefits from July 1, 2000, to around June 1, 2002.  (Defs.' First Am. Countercl. ¶ 4.)  In 2002, the Defendants reviewed her claims and discontinued her benefits.  She appealed the denial of benefits, but the decision to terminate benefits

---

[1]In a prior order, the Court established this as the correct definition of disability under the Plan. [Doc. 32.] The Plaintiff, however, maintains that the Court should use the definition of disability contained within the Plan's Summary Plan Description. (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 3 n.1.)  The Court declines the Plaintiff's invitation to revisit its prior determination.

was upheld.  On July 16, 2004, the Plaintiff filed suit against the Defendants, asserting claims for wrongful termination of benefits and associated torts.

On September 7, 1999, Dr. Howard Ehrenfeld first diagnosed the Plaintiff with cervical radiculopathy.  This condition, caused by a problem with the nerve roots in the neck, includes symptoms such as numbness, tingling, and weakness in the arms. Dr. Ehrenfeld subsequently ordered an MRI, which indicated a herniated disc in her neck.  Based on these results, he referred the Plaintiff to a neurosurgeon, Dr. Michael G. Hartman.   Following his initial examination, Dr. Hartman confirmed Dr. Ehrenfeld's diagnosis and, on November 13, 1999, he performed an anterior cervical disectomy and fusion on the Plaintiff.  Although the surgical site healed normally and she continued to make slow progress in her physical therapy, the Plaintiff complained of persistent neuropathic pain, which she claimed interfered with her activities of daily living.  Dr. Hartman referred her to Dr. William F. Keeton for pain management, and Dr. Keeton ordered an electromyogram ("EMG"), which indicated "modest dennervation potentials" in her upper extremities, suggestive of her condition. (Admin. Rec., at 80-81.)

On November 30, 2000, Dr. Hartman reported that the Plaintiff continued to complain of problems with her neck and numbness in her arms.  He stated, however, that her "persistent ambiguous symptomatology" did not appear to have any

neurological origin, that she appeared to have little difficulty doing anything if she set her mind, and that he could not rationalize her as being disabled in any way. (Id. at 312.) During a subsequent visit by the Plaintiff to Dr. Ehrenfeld, he ordered another MRI, which revealed a new protruding disc. When the Plaintiff returned to Dr. Hartman on December 20, 2001, however, he saw no concern with the disc. He also stated in his report that the Plaintiff had made inquiries regarding his notes from her November 30, 2000 visit. She was apparently concerned about the adverse effect his "verbiage" might have on her pursuit of disability benefits. (Id. at 311.) According to this later report, Dr. Hartman explained to her that his office did not give out social security and that it was not possible for him to "really describe a person as being disabled or not." (Id.) He suggested she undergo a physical medicine assessment and referred her to Dr. Mark Feeman for that purpose.

Dr. Feeman examined the Plaintiff on January 4, 2002, noting tenderness and spasms in her neck and shoulders, decreased strength in her upper extremities and vascular changes consistent with reflex sympathetic dystrophy ("RSD"). He diagnosed her with cervical herniated nucleus pulposus with a RSD component and opined that she was permanently disabled. (Id. at 149-51.)

On February 12, 2002, the Plaintiff returned to Dr. Ehrenfeld, who completed a physical capacities form for Defendant Liberty Mutual. Dr. Ehrenfeld reported that

the Plaintiff could perform sedentary work for an eight hour day and was capable of handling, grasping and fine finger dexterity for 30 minutes at a time.  (Id. at 161.)  She was also capable of lifting less than ten pounds on occasion, and of walking and standing for up to one hour a day.  She was incapable, however, of squatting, bending, kneeling, climbing stairs or ladders, driving on the job, pushing, pulling or reaching.

On March 21, 2002, the administrator terminated the Plaintiff's benefits. Following an appeal, the Plaintiff's attorney hired Mike Head, a vocational rehabilitation consultant, to review her claim.  Mr. Head reviewed the medical records, which included a June 28, 2002 evaluation by Dr. Ehrenfeld as to the current state of the Plaintiff's condition.  This report differed from Dr. Ehrenfeld's February review in that he now opined: (1) the Plaintiff could not forward flex her head, as one might while working at a computer or desk; (2) she could not grasp, twist or turn objects with her hands; (3) she could reach for 10% of the day; (4) she experienced "moderately severe pain" consistent with her diagnosis, which was precipitated by "fatigue, movement of the upper extremities, static position forward position of the neck," and "use of the hands"; and (5) her pain "often" interfered with her attention and concentration capacities.  (Id. at 208-12.)  Finally, he reported that she was not a malingerer.

Based on this report from her doctor, Mr. Head concluded that the Plaintiff was "unable to meet the full demands of sedentary work." (Id. at 205.)  He stated that these documented pain levels were severe enough to preclude the Plaintiff from being able to perform any work that required sustained attention and concentration.  This included all work falling in the skilled or semi-skilled categories and, in his opinion, this left only unskilled work as a possibility.

On July 29, 2002, the Defendants requested that a consulting physician, Dr. Gale Brown, review the Plaintiff's medical records and issue a medical opinion.  She concluded to a reasonable degree of medical certainty that the Plaintiff appeared capable of at least sedentary work on a full time basis with accommodation for her neck.  She based this decision on: (1) Dr. Ehrenfeld's determination that the Plaintiff could perform sedentary work; (2) the lack of objective medical evidence or functional documentation supporting his restrictions on her ability "to perform repetitive handwork, lifting less than 10 lbs., standing, walking, bending at the waist level, stair climbing, and reaching below shoulder level"; (3) Dr. Feeman's failure to offer any support for his opinion that she met the definition of disabled and the fact that no other treating physician had substantiated his diagnosis of RSD; and (4) Dr. Ehrenfeld's acknowledgment that his June 28, 2002, physical restrictions were based on the Plaintiff's subjective pain complaints and self-reported limitations rather than

objective documentation. (Id. at 237-45.)  Finally, the Defendants employed HUB Enterprises to perform surveillance on the Plaintiff.  Some of this footage, taken on August 16, 2002, captured the Plaintiff standing at length, driving to numerous locations, walking, and bending.  (Id. at 248-270.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. DISCUSSION

A.     Administrator's Denial of Long Term Disability Benefits

1.     Standard of Review

Under ERISA, a plan participant or beneficiary may bring a civil action in federal court to "recover benefits due to him under the terms of his plan."  29 U.S.C. § 1132(a)(1)(B).  At the outset in an action such as this one, the Court must determine the standard by which to review the administrator's decision to deny the disability benefits claimed by Plaintiff.  The Act itself does not provide a standard of review for decisions of a plan administrator or fiduciary.  In the absence of statutory guidance, the Supreme Court has established a range of standards for judicial review of benefits determinations under ERISA.  In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held:

> [A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. . . .  Of course, if a benefit plan gives discretion to an administrator or fiduciary operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion.

Id. at 115 (citations and quotation marks omitted).  Consistent with Firestone, the Eleventh Circuit has adopted three standards for judicial review of an administrator's benefits determination: (1) *de novo* review where the plan administrator is not

afforded discretion; (2) arbitrary and capricious standard when the plan grants discretion to the plan administrator; and (3) heightened arbitrary and capricious standard where there is a conflict of interest. Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1134 (11th Cir. 2004); Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1449-50 (11th Cir. 1997). Under the heightened arbitrary and capricious standard, the burden shifts to the plan administrator or fiduciary, acting under a conflict of interest, to show that its interpretation of plan terms committed to its discretion was not tainted by self-interest. Florence Nightingale Nursing Svc., Inc. v. Blue Cross/Blue Shield of Alabama, 41 F.3d 1476, 1481 (11th Cir. 1995). In this case, the Court previously established that there was a conflict of interest, and thus, the heightened arbitrary and capricious standard of review applies. [Doc. 32, at 4.] Under this standard, the administrator is entitled to significantly less deference. Wise v. Hartford Life and Accident Ins. Co., 360 F. Supp. 2d 1310, 1317 (N.D. Ga. 2005) (citing Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1558 n.1 (1990)).

A district court's review of the administrator's decision does not always reach that stage of analysis, however. The Eleventh Circuit has adopted a multi-step approach for reviewing virtually all ERISA plan benefit denials. See Williams, 373 F.3d at 1138 (establishing a six-prong analytical framework). Because this Court has

already established that a conflict of interest exists, that approach can be condensed into the following three part inquiry. See Wise, 360 F. Supp. 2d at 1317-18.  First, the Court must apply a *de novo* standard of review "to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision."[2] Id. at 1318 (quoting Williams, 373 F.3d at 1138).  Second, if the Court determines that the administrator's decision was wrong, it must examine the reasonableness of that decision under the arbitrary and capricious standard of review.  See Williams, 373 F.3d at 1138.  Finally, where the court finds that the decision was wrong but reasonable, it must examine whether the administrator's decision was tainted by self interest.  See Potter v. Liberty Life Assur. Co. of Boston, 132 Fed. Appx. 253, 259 (11th Cir. 2005) (citing Brown, 898 F.2d at 1566-67).

2.     De Novo Review

As an initial matter, the Plaintiff argues that because the Defendants at first approved the Plaintiff's disability claim, they have the burden of showing that a change in the Plaintiff's status occurred that caused them to terminate those benefits. Under ERISA, a disability claimant bears the burden of showing that she was

---

[2]In reviewing the administrator's decision, this Court has already determined that it will consider only those facts that were known to the administrator at the time of the denial of her claim and her appeal. [Doc. 32, at 4.]

disabled.  Brucks v. Coca-Cola Co., 391 F. Supp. 2d 1193, 1205 (N.D. Ga. 2005)

(citing Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir.

1998)).  The Plaintiff must thus demonstrate that she was unable to perform each and

every duty of her job during the two year elimination period.

In order to determine whether the administrator's decision was *de novo* wrong,

i.e., whether the trial court disagrees, the Court must stand in the shoes of the

administrator and start from scratch, examining all the evidence before the

administrator as if the issue had not been decided previously. See Hanna v. WCI

Communities, Inc., 348 F. Supp. 2d 1322, 1329 (S.D. Fla. 2004).  As stated above, an

employee meets the requirements of disability if:

> During the Elimination period and the next two years, the
> employee remains unable to perform any and every duty of his or her
> regular job or any other job for which he or she is qualified by training,
> education or experience.
> After two years, the employee remains unable to perform any
> occupation for which the employee is qualified by training, education,
> or experience and the employee is receiving Social Security Disability.

(Admin. Rec., at 165) (emphasis added).[3]  The administrator ruled that the Plaintiff

did not demonstrate a disability under the first prong of this definition.[4]

The claims administrator previously stated the requirements for the Plaintiff's

position as a senior vice president in its denial of long term benefits.  This sedentary

position, according to a Wachovia representative, requires the Plaintiff to sit up to

seven hours of an eight hour day.  She spends approximately 25% of the day on phone

and approximately 25% on the computer.  (Id. at 166.)  Additionally some travel is

required, but it involves no physical activity other than lifting personal items such as

a briefcase or a laptop computer.  In completing a questionnaire regarding her work

---

[3]This proves to be a more narrow definition of disability than other plans that
require only that a claimant show the inability to perform one of the duties of her own
job.  See, e.g., Hamall-Desai v. Fortis Benefits Ins. Co., 370 F. Supp. 2d 1283, 1288
(N.D. Ga. 2004) (requiring a disability that "prevents you from performing at least one
of the material duties of your regular occupation"); see also David P. Martin, The
Subtle Snake: Long-Term Disability Insurance Under ERISA, 66 Ala. Law. 279, 285
(July 5, 2005) (advising employees, "[o]bviously, the best plan to have is an 'own
occupation' plan, but this may cost more").

[4]The Defendants also attempt to justify the denial of benefits under the second
prong of this definition because the Plaintiff failed to receive Social Security within
the two year period.  (Defs.' Mot. for Summ. J., at 9-10.)  Under ERISA, however, an
administrator is required to set forth the specific reasons for a denial of benefits.  29
U.S.C.A. § 1133 (1); see also Reich v. Ladish Co. Inc., 306 F.3d 519, 524 n.1 (7th Cir.
2002) (holding that the administrator "was required to give Reich every reason for its
denial of benefits at the time of the denial").  Here, the administrator never mentioned
the second prong as a reason for any of the denials.  The Court will thus not consider
it in reviewing the Plaintiff's claim.

experience, the Plaintiff's self described tasks/duties included planning and managing audits of banking operations, reviewing workpapers, consulting with clients, writing reports & other documents, participating in company projects, conducting meetings and presentations, supervising employees, performing job evaluations, and hiring personnel.  (Id. at 148.)

To meet her burden of establishing a disability under the Plan, the Plaintiff relies primarily on the following evidence.  First, she argues that the evaluation by her primary neurologist, Dr. Ehrenfeld, shows that she was disabled.  In response to an inquiry from her vocational rehabilitation consultant, Dr. Ehrenfeld reported that the Plaintiff could perform fine finger dexterity for 30 minutes and then required a one hour break, that she could not grasp or turn anything, that she could not "forward flex her neck/head such as one might when working at a computer or desk," that she could reach for only 10% of the day, and that her pain level was "moderately severe."  (Id. at 208-211.)   Based on this review, the Plaintiff concludes that it would take her up to twelve hours to perform four hours of work.  (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 17.)  The Plaintiff also offers the opinion of Mike Head, who determined that the Plaintiff's pain would be a significant impediment and render her "unable to meet the full demands of sedentary work."  (Admin. Rec., at 205.)  She next points to the supporting opinions of Drs. Hartman and Feeman.  She argues that Dr. Hartman's

reports show that during her recovery from surgery, she could not work, that her condition was not likely to change, and that he was not qualified to determine whether she was disabled. (Id. at 14, 28, 59, 67.) Moreover, Dr. Feeman concluded, following an independent medical examination, that she was disabled. (Id. at 149-50.)[5] Finally, the Plaintiff claims that the surveillance footage supports her disability claim because the low level of activity captured on video demonstrates she was incapable of working an eight hour day.

After reviewing the administrator's decision *de novo*, the Court finds the Plaintiff has failed to demonstrate that she was unable to perform any of the duties of her job or any other job for which she was qualified.   The following evidence demonstrates that she did not meet the Plan's definition of disabled.   First, in his original assessment of her condition, Dr. Ehrenfeld reported that she was capable of working eight hours per day at a sedentary job.  (Id. at 161.)  Specifically, he concluded that she was capable of handling and grasping things, and of engaging in

---

[5]The Plaintiff argues that the Defendants were required to perform their own independent medical examination before denying her claim.  Although such examinations are certainly helpful, the Defendants are not required under ERISA to perform them, as it is the Plaintiff's responsibility to prove she meets the Plan's disability definition. See Brucks, 391 F. Supp. 2d at 1205 (citing Horton, 141 F.3d at 1040); Layes v. Mead Corp.,132 F.3d 1246, 1251 (8th Cir. 1998) (holding that a defendant is not required to perform an independent medical examination when the medical evidence relied upon by the plaintiff is "on its face insufficient to support a conclusion that he was totally disabled").

fine finger dexterity for up to a third of an eight hour day.  (Id.)  He thus did not report that she could not work or was totally disabled.  Indeed, he expressly stated the opposite.  Moreover, although the Plaintiff's efficiency at work might have decreased, the Court concludes that she still held the ability to perform many of her self described job duties such as consulting with clients, conducting meetings and presentations, supervising employees, preparing job evaluations, and reviewing paperwork.  (Id. at 148.)

Furthermore, Dr. Ehrenfeld's subsequent evaluation does not alter this conclusion.  He again states that she is capable of sedentary work, but also reports that she has "moderately severe pain" and cannot forward flex her neck/head in order to work at a computer or desk.  (Id. at 234.)  In conferring with Dr. Ehrenfeld about this evaluation, however, Dr. Brown determined that a physical exam had "revealed no objective neurological deficits" and that the physical restrictions issued at that time were based on the Plaintiff's reported functional capacity and subjective complaints. (Id. at 246.)   The Court finds that these subjective complaints lack objective credibility, given Dr. Hartman's November 30, 2000 report that: (1) the Plaintiff had "persistent ambiguous symptomatology" that did not seem to have any neurological basis; (2) she had good range of motion in her neck; (3) she had "very little difficulty doing anything" if she set her mind; and (4) she appeared to have no desire to return

to work.  (Id. at 312.)  See Fick v. Metropolitan Life Ins. Co., 347 F. Supp. 2d 1271, 1286 (S.D. Fla. 2004) ("[T]he very concept of proof connotes objectivity"); Mobley v. Continental Cas. Co., 405 F. Supp. 2d 42, 48 (D. D.C. 2005) (stating that a plaintiff's subjective claims of discomfort, standing alone, are not sufficient to render her disabled).  Also adding skepticism to these later reported pain limitations is Dr. Hartman's notation that the Plaintiff had requested that he change his notes from that November office visit.  (Admin. Rec., at 311.)

Furthermore, it appears that Mr. Head relied primarily upon Dr. Ehrenfeld's report in concluding that the Plaintiff was unable to perform sedentary work.  He emphasizes that the Plaintiff's consistent and significant pain would prevent her from being able to focus at any skilled or semi-skilled job.  (Admin. Rec., at 205.)  Thus, this skepticism regarding Dr. Ehrenfeld's report also taints the vocational rehabilitation evaluation.

The other evidence pointed to by the Plaintiff is similarly unpersuasive.  Dr. Feeman's exam does not conclusively demonstrate that she was unable to perform any of the duties of her job, as required under the Plan's narrow definition.  In his medical exam report, Dr. Feeman states only, "Plan: I agree that patient meets the defination[sic] of permanent disability."  (Id. at 150.)  The conclusion offers no explanation as to what the term "disabled" means in Dr. Feeman's opinion or why she

meets the definition. (Id. at 149-50.)[6] His determination that she was suffering from RSD syndrome is also unsupported by any of her other doctors, including Dr. Ehrenfeld. Finally, the Court finds that the surveillance footage also weighs against the credibility of Dr. Ehrenfeld's physical capacities evaluation. Some of the activities the Plaintiff was filmed performing–specifically, driving to numerous locations and bending–are tasks that Dr. Ehrenfeld reported the Plaintiff could not do. It thus similarly fails to support the Plaintiff's claim that she was incapable of working.

This Court holds that the Plaintiff has not met her burden of demonstrating a disability under the Plan's definition. Importantly, two of the Plaintiff's own doctors, as well as the Defendants' consulting physician, demonstrate that she did not meet the Plan's definition of disabled. The evidence thus demonstrates that the administrator's decision was not *de novo* wrong, and granting the Defendants' motion for summary judgment is warranted.

---

[6]It is also unclear with whom Dr. Feeman is agreeing in making his assessment. The Court notes that the Plaintiff was referred to him by Dr. Hartman, who stated that he could not "rationalize [the Plaintiff] as being disabled in any manor[sic]." (Id. at 312.)

B.      Breach of Fiduciary Duty

The Plaintiff also brings a claim under section 502(a)(2) of ERISA claiming that the Defendants breached their fiduciary duty to her through their handling and denial of her LTD benefits claim.  Section 502(a)(2) of ERISA provides that "a civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under [section 409] . . ."  29 U.S.C. § 1132(a)(2). Section 409 provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).  This section of ERISA was interpreted by the Supreme Court as providing "relief singularly to the plan" and "remedies that would protect the entire plan," rather than the rights of an individual beneficiary.  Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 (1985); see also Woods v. Southern Co., 396 F. Supp. 2d 1351, 1361 (N.D. Ga. 2005).   Accordingly, for relief to be available under section 409, the LTD Plan itself must have suffered a loss.  Matassarin v. Lynch, 174 F.3d 549, 566 (5th Cir. 1999) (section 409 of ERISA limits claims to those that inure to the benefit of the entire plan, and not to individual beneficiaries); McDonald v.

Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir. 1995) (to seek relief under ERISA section 409, a plaintiff must make out a breach of fiduciary duty and a prima facie case of loss to the plan); see also Sinclair v. United Healthcare of Georgia, Inc., 1997 U.S. Dist. Lexis 23696, at *5-6 (N.D. Ga. 1997) ("because [section 409] does not provide a private right of action for individuals, plaintiffs do not have a cause of action for breach of fiduciary duty").

A plaintiff can recover under this section only where she sets forth facts that, if proven, would establish a loss to the Plan, a prerequisite to relief under ERISA section 502(a)(2).  Massachusetts Mut. Life Ins. Co., 473 U.S. at 140-42; McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (1995).  Here, the Plaintiff does not bring her action on behalf of the LTD Plan, and she cannot show that others were affected by any alleged breach.  Her evidence thus fails to demonstrate a genuine issue of fact on this claim.

C.    Wrongful Interference with Employment Rights

The Defendants move for summary judgment on the Plaintiff's claim that by "wrongfully, intentionally, arbitrarily and capriciously terminating and denying Eldridge's LTD benefits claim, Defendants interfered with and denied Eldridge's present and future rights and interests under the Wachovia Corporation Group Benefit Plan." (Complaint, ¶ 37.)  The Plaintiff has failed to respond, indicating that she does

not oppose the motion. L.R. 7.1(B). The Court deems this failure to be an abandonment of the claim. See City of Lawrenceville v. Ricoh Electronics, Inc., 370 F. Supp. 2d 1328, 1333 (N.D. Ga. 2005). Moreover, as the Court has already determined that the administrator's decision was not wrong, there can be no claim for wrongful interference with her rights. The Court thus grants the Defendants' motion.

D.     Failure to Provide Documents

The Plaintiff's final allegation is that the Defendants failed to provide her with several documents to which she was allegedly entitled under section 502(c) of ERISA. This statutory provision addresses an administrator's failure to comply with requests for information from plan participants. 29 U.S.C. § 1132(c). It provides that, upon the discretion of the Court, a plan administrator may be subject to fines of up to one hundred and ten dollars per day for failure to comply with such requests for information. Id.; 29 CFR § 2575.502c-1. In exercising this discretion, a court should consider whether a defendant's failure to provide documents was made in bad faith and whether it prejudiced a plan beneficiary. See Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1232 (11th Cir. 2002). This penalty is designed as a punitive damage to the violator, not as compensation for the beneficiary. Id.

Here, the Plaintiff alleges that she was denied three Plan documents: (1) 1992 Wachovia Corporation Group Benefits Plan; (2) Wachovia 1999 Employee

Handbook; and (3) policy/procedure manual(s).  She also claims she was denied two other "pertinent" documents, Dr. Gale Brown's report and HUB Enterprises' surveillance reports.  The record demonstrates, however, that on May 14, 2002, the Plaintiff made an extensive document request, which included certified copies of any Plan documents.  (Admin. Rec., at 173-175.)  The Defendants promptly responded to that request and provided extensive documents.  (Id. at 180, 183-84.)  The Court finds that the Plaintiff has not shown that she was materially prejudiced by any failure on the part of the Defendants or that the Defendants' failure was in bad faith.  As to the other "pertinent" documents, the Plaintiff has shown no justification for the receipt of those items under ERISA.  See Brucks, 391 F. Supp. 2d at 1212 ("In the absence of Eleventh Circuit authority on this issue, the Court declines to rewrite section 1132(c) to authorize statutory penalties against an administrator for failure to provide documents other than those identified in the statute itself.").  The Court thus declines to impose fines and grants the Defendants' motion for summary judgment on this claim.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment [Doc. 36] is GRANTED and the Plaintiff's Motion for Summary Judgment [Doc. 37] is DENIED.

SO ORDERED, this 6 day of March, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge